UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

JASON SCHULTZ,

                                        Plaintiff

                                                                    DECISION AND ORDER

-vs-
                                                                    10-CV-6614 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                        Defendant.

_____

APPEARANCES

For the Plaintiff:              Mark M. McDonald, Esq.
                                Bond and McDonald
                                91 Genesee Street
                                Geneva, New York 14456

For the Defendant:              Kathryn L. Smith, A.U.S.A.
                                United States Attorney's Office
                                100 State Street
                                Rochester, New York 14614

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Jason Schultz ("Plaintiff") for Social Security disability

benefits.  Now before the Court is Defendant's motion [#4] for judgment on the

pleadings and Plaintiff's cross-motion [#8] for judgment on the pleadings.

PROCEDURAL HISTORY

On May 4, 2007, Plaintiff applied for disability and Supplemental Security Income ("SSI") benefits.  On August 23, 2007, the Social Security Administration ("SSA") denied the application.  On August 7, 2009, a hearing was held before Administrative Law Judge Mark Solomon ("the ALJ").  On October 16, 2009, the ALJ issued a decision finding that Plaintiff was not disabled.  Plaintiff appealed to the Appeals Council, and submitted additional medical information from James Mark, M.D. ("Mark"), Plaintiff's orthopedist.  On September 8, 2010, the Appeals Council denied the appeal.  On October 29, 2010, Plaintiff commenced this action.

Plaintiff contends that the ALJ erred in several ways.  First, Plaintiff maintains that the ALJ failed to classify Plaintiff's obsessive-compulsive disorder ("OCD"), personality disorder, and cognitive disorder as serious impairments.  Plaintiff asserts that the ALJ failed to recognize that each of these conditions is a separate impairment, and instead, mistakenly lumped them together as attention-deficit-hyperactivity disorder ("ADHD").  Plaintiff further states that even if these conditions are not "serious impairments" on their own, they are serious when considered together.  Particularly as to Plaintiff's cognitive disorder, Plaintiff contends that the ALJ erroneously dismissed the opinion of Marc Gaudette, PsyD.  ("Gaudette"), and substituted his own medical judgment.  At the same time, though, Plaintiff states that the title used to describe his impairments is "inconsequential," since what really matters is the limitations that those impairments impose on him, which the ALJ failed to properly consider. Pl. Memo of Law [#8-2] at 19.

Next, Plaintiff maintains that the ALJ's Residual Functional Capacity ("RFC") determination was erroneous.  On this point, Plaintiff contends that, in addition to disregarding Gaudette's opinion, the ALJ failed to give proper weight to an RFC assessment by psychiatrist Elizabeth Michaels, M.D. ("Michaels").  Plaintiff further states that the ALJ gave undue weight to a single treatment note by Michaels (Dr. Michaels' report dated 9/29/08), which indicated that Plaintiff was doing well, while giving too little weight to Michaels' overall treatment record.  Plaintiff also asserts that the ALJ and the Appeals Council failed to properly consider the opinion of Dr. Mark, regarding Plaintiff's chronic knee pain and the effect that it would have on Plaintiff's attention, concentration, and ability to work on a sustained basis.

Finally, Plaintiff contends that the ALJ erred by failing to call a vocational expert ("VE") to testify at the hearing.  In that regard, Plaintiff maintains that his ability to perform a full range of sedentary work was significantly eroded by his nonexertional impairments, and that it was therefore erroneous for the ALJ to rely on the Medical-Vocational Guidelines in finding that Plaintiff was not disabled.

## VOCATIONAL HISTORY

Plaintiff was 37 years old at the time of the hearing. (26)[1].  Plaintiff dropped out of high school in the Eleventh Grade. *Id*.  Plaintiff's usual work involved landscaping and painting. *Id*.

---

[1]Unless otherwise noted, references are to the administrative record.

## ACTIVITIES OF DAILY LIVING

Plaintiff spends much of his time during the day attending meetings of Narcotics Anonymous ("NA") and going to appointments for addiction and mental health therapy. (27).  Plaintiff has leg pain throughout the day, but does not take narcotic pain medication because of concerns about his history of addiction and substance abuse. (33).  Plaintiff can sit for at least an hour, and walk for thirty minutes. (30).  He does not use a cane or other assistive device. (31).  Plaintiff can care for his own personal needs, and also provides some care for his infant child. (28, 30).  Plaintiff has a driver's license and takes public transportation by himself. (29).  Plaintiff feels depressed four-to five days per week. (32).  When he feels depressed, Plaintiff displays Obsessive Compulsive Disorder ("OCD") behavior, such as cleaning and counting his money. (32).  Plaintiff has trouble concentrating. (32).  Plaintiff has nightmares about physical and sexual abuse that he suffered as a child, and about the death of his six-year-old son, who died after being struck by a car in 2002. (33).

## MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety.  It is sufficient for purposes of this Decision and Order to note the following facts.

On August 30, 2002, Plaintiff was involved in a serious motor vehicle accident ("MVA") which resulted in broken ribs, internal injuries requiring the removal of his

spleen, a "tibial plateau fracture [of the right leg], extremely displaced,"[2] and a head injury suffered when Plaintiff's head went through the windshield. (198)  The tibial plateau fracture required orthopedic surgery to reconstruct Plaintiff's right knee and tibia. (198)  Although the surgery was successful, Plaintiff was left with arthrofibrosis, which, due to inflammation and scar tissue, resulted in the development of dense fibrous tissue which restricts the joint.[3] (144)  As for the head injury, it was "a closed head injury with a small right subdural hemorrhage and some intraventricular and frontal lobe contusions." (213, 257, 264)  Following the MVA, Plaintiff complained of "worsening headaches and persistent memory loss," which his physician indicated was "consistent with a post concussive syndrome, which can persist for some time." (204)

On October 4, 2003, Robert Bronstein, M.D. ("Bronstein"), a treating orthopedist, indicated that because of Plaintiff's knee injury, he would never be able to "return to labor intensive work," and "should be retrained for sedentary type work." (144)

On October 10, 2003, Plaintiff was seen at the Clifton Springs Pain Treatment Medicine office by Donovan Holder, M.D. ("Holder"), in connection with his knee pain. (370-372)  Plaintiff complained of a "constant intense throbbing sensation" in his knee, and increased pain with walking. (370)  Plaintiff admitted to being a heavy drinker, but claimed that he had not consumed alcohol for ten months. (371)  Holder presribed Neurontin, Pamelor, Lidoderm patches, and a TENS unit. (372)

---

[2]According to one medical website, "[a] tibial plateau fracture occurs at the top of the shin bone, and involves the cartilage surface of the knee joint."
http://orthopedics.about.com/od/brokenbones/a/tibia_2.htm

[3]See, http://orthopedics.about.com/cs/aclrepain/g/arthrofibrosis.htm

On May 15, 2005, Plaintiff was involved in an all-terrain vehicle ("ATV") accident in which he injured his leg and head, and apparently lost consciousness. (332)  Plaintiff was brought to the emergency room ("ER") on a backboard. (332)   A CT scan of Plaintiff's head showed "no acute changes." (333, 337)

On November 8, 2005, W. Glenn Jamison, M.D. ("Jamison") completed a discharge summary after Plaintiff completed a five-day stay at Clifton Springs Hospital, where he was admitted for depression and suicidal thoughts. (412)  Plaintiff reported "occasional falling with head injuries while drunk." (412)  Jamison indicated that Plaintiff seemed depressed upon admission, but that "[i]mmediately following detox, he was basically euthymic and free from any depression." (413)  Jamison diagnosed Plaintiff with polysubstance dependence, major depression, post-traumatic stress disorder ("PTSD"), and personality disorder NOS [not otherwise specified] with impulsive and passive traits." (413)

On September 14, 2005, Plaintiff went to the ER for recurrent vomiting, which he attributed to "being out of control with drug and alcohol use, including heroin." (328) Plaintiff reported being addicted to heroin and having a history of alcoholism and depression. (328)

In January 2006, Plaintiff underwent a two-day neuropsychology exam by Gaudette. (584-590).  The evaluation was requested by Finger Lakes Alcoholism Counseling and Referral Agency ("FLACRA"), in connection with Plaintiff's drug and alcohol rehabilitation treatment.  Gaudette conducted a clinical interview and conducted a variety of tests, including the Wechsler Adult Intelligence Scale -III, Wechsler Memory Scale - III, and Beck Depression Inventory - II.  (585)  Gaudette indicated that Plaintiff

was cooperative and showed good effort on the testing, and that the test results were therefore considered reliable and a valid estimation of Plaintiff's cognitive functions. (586)  Gaudette reported that Plaintiff seemed to be in a pleasant mood, but his facial affect was restricted and he seemed dysphoric. (586)  Gaudette observed that Plaintiff was taking psychotropic medications and receiving ongoing counseling. (589)  Gaudette noted that Plaintiff had a history of head injuries, including an MVA  in 2002, an ATV accident, and a couple of instances where he was assaulted. (585)  Plaintiff reported difficulty focusing at times,  some short-term memory problems, and some difficulty spelling. *Id*.  Plaintiff also reported that he struggled with depression since the death of his son in 2002.  Gaudette indicated that Plaintiff's intellectual functioning was in the low-average range. (586)  Plaintiff's attention and immediate recall were somewhat impaired and in the borderline range. *Id*.   Gaudette indicated that Plaintiff's results were mostly within normal limits, although his ability to acquire and encode new information was marginal to weak. (588)  Gaudette stated that Plaintiff's cognitive impairments might be exacerbated in a real-life work situation. (589)  Gaudette indicated that "given [Plaintiff's] cognitive deficits" and the length of time that he had been out of school, it would probably take Plaintiff one to two years to obtain his GED, assuming that he had the assistance of a tutor. (589-590)  Gaudette indicated that with Plaintiff's leg injury and pain and cognitive problems, he could only work part-time, "working no more that about 4 hours per day." (590)  Moreover, Gaudette opined that Plaintiff should not "be simply plugged into any job," but instead, would need the assistance of a vocational counselor to find suitable work. (590)  Gaudette's diagnosis

was "294.9 Cognitive Disorder NOS."[4] (590)

On June 13, 2006, Plaintiff was admitted to a drug and alcohol rehab program at Clifton Springs Hospital after he was released from jail for stealing his sister's computer. Elizabeth Romero, M.D. ("Romero") examined Plaintiff and reported that he seemed "very guarded, anxious, and depressed." (395)  Also on June 13, 2006, David Tiller, M.D. ("Tiller") reported that Plaintiff's "affect was quite depressed." (389)  Plaintiff reported a long history of drug and alcohol abuse, since he was age 11, and indicated that he "abuses whatever opiate medication he can get and that includes Percocet, Vicodin, Fentanyl, and OxyContin." (389)  Plaintiff admitted to smoking marijuana daily, and indicated that he had last used crack cocaine in March 2006. (389)  Plaintiff reported that he had been "hyperactive as a child," and had anxiety and panic attacks four times per week. (389)  Tiller noted that Plaintiff had been taking Remeron for depression, without much benefit, and Tiller instead prescribed Effexor  for depression, and Strattera for ADHD. (390)  Tiller noted that while Plaintiff was in in-patient rehab, Plaintiff's "effort in this program was well above average." (390)

On June 14, 2006, Michaels completed a report, also describing Plaintiff's participation in in-patient rehab at Clifton Springs Hospital. (391-393)  Plaintiff reported to Michaels that, "[i]n school, he had problems with concentration and impulsivity.  . . .

---

[4] *See, Remick v. Astrue*, No. 10–cv–578–PB, 2011 WL 5025315 at *6, n. 11 (D.N.H. Oct. 21, 2011) ("294.9 Cognitive Disorder Not Otherwise Specified is a "category [ ] for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in this section...." Diagnostic & Statistical Manual of Mental Disorders: DSM–IV–TR at 179 (4th ed.2000).")

He did have some learning disabilities and required on-on-one for teaching." (391)
Plaintiff reported falling down stairs as a toddler and being knocked unconscious, in
addition to the head injury he sustained in his MVA. (391)  Michaels diagnosed Plaintiff
with polysubstance dependence, "major depression, recurrent, severe," ADHD, and
panic disorder. (392)

Between June 2006 and April 2007, Plaintiff participated in outpatient drug and
alcohol treatment at FLACRA. (375-377)  Plaintiff's attendance in that program was
satisfactory, and involved attending sessions two or three days per week for two hours.
(375)  Plaintiff's counselor indicated that he made "fair improvement." (376)

On May 14, 2007, in response to Plaintiff's complaints of right knee pain, a CT
scan was performed, which showed "remarkable osteopenia [low bone mineral density]
in the femoral condyles," which "might suggest reflex sympathetic dystrophy." (295)  X-
rays taken at the same time showed "arthritic changes involving the joint space
probably secondary to the tibial pleateau fracture." (297)

On July 16, 2007, Harbinder Toor, M.D. ("Toor") performed a consultative
internal medicine examination. (379-382)  Plaintiff reported  "constant, sharp, shooting
pain" in his knee, and claimed to have difficulty standing and walking for long periods.
(379)   Plaintiff admitted having previously used drugs, including cocaine and heroin,
and indicated that he stopped using alcohol in 2006. (379)  Upon examination, Plaintiff
had "slightly restricted" movement in his right knee, but full strength in all extremities.
(381)  Toor indicated that Plaintiff had moderate limitations for standing and walking for
long periods, as well as for bending, lifting, twisting, and putting any pressure on the
right leg. (382)  Toor further stated that Plaintiff should avoid heavy activity and heavy

lifting. (382)

On July 16, 2007, Melvin Zax, Ph.D. ("Zax") performed a consultative psychiatric evaluation. (383-386)  Plaintiff reported having three hospitalizations for psychiatric problems.  Plaintiff complained that he was depressed over the death of his six-year-old son five years earlier, which was all that he thought about. (384)  Plaintiff indicated that his depression caused him not to eat or sleep properly. *Id*.  Plaintiff stated that he stopped drinking alcohol in 2006, and stopped using drugs shortly before that. (384)  Plaintiff told Zax that his typical days was as follows:   "[H]e goes to meetings, has coffee, goes to his group and later calls his sponsor and eventually goes to bed." (385)  On examination, Plaintiff's affect was flat, and his attention and concentration were impaired.  Zax reported that Plaintiff "did serial threes with one error in seven operations, but did arithmetic problems at quite far below an average level." (385)  As for "cognitive functioning," Zax stated that, "intellectually, he is borderline." (385)  Zax indicated that his examination did not support Plaintiff's claim of depression. (385)  Zax stated that Plaintiff could follow and understand simple directions.  Zax indicated that Plaintiff had a history of substance abuse, and should not manage his own funds until he "has a good long stretch of abstinence." (386)   Zax opined that "[s]ome effort should be made to encourage [Plaintiff] to work eventually at something that could be self-supporting," but that, "[g]iven his history, the prognosis is guarded." (386)

On August 8, 2007, M. Apacible ("Apacible"), a non-treating, reviewing agency psychiatrist, completed a report which stated, *inter alia*, that  Plaintiff had "moderate" "difficulties in maintaining concentration, persistence or pace." (430)  Apacible further stated that Plaintiff was moderately limited with regard to carrying out detailed

instructions, maintaining attention and concentration for extended periods, and responding appropriately to changes in the work setting." (434-435)

On October 7, 2007, Plaintiff was admitted to Clifton Springs Hospital with self-inflicted cuts to his wrist. (684)  Plaintiff indicated that he was suicidal because of his relapses into substance abuse and because of his son's death. *Id*.  A discharge summary note by Dr. Jamison diagnosed  Plaintiff with major depression, recurrent and severe, polysubstance dependency and abuse, and ADHD "by history per patient." (686)  Jamison referred Plaintiff for further drug rehabilitation treatment.

On November 30, 2007, Michaels completed a report concerning her examination of Plaintiff while he was admitted to Clifton Springs Hospital following his suicide attempt. (689-693)  Michaels indicated that Plaintiff suffered from PTSD as a result of sexual abuse he suffered as a child. (689)  Michaels noted that Plaintiff had previously attempted suicide by overdosing. *Id*.  Plaintiff reported to Michaels that he felt depressed and worthless, with loss of energy.  Michaels stated, "He has a history of hyperactivity , impulsivity and [illegible] as noted in previous evaluations consistent with the diagnosis of ADHD.  He also has OCD symptoms . . . .  He would like to go back on Strattera." (689-690)  Plaintiff appeared teary-eyed and depressed. (690)  Michaels' diagnosis included opiate dependence, cocaine dependence, polysubstance abuse, major depression recurrent, ADHD, and OCD. (690)

In April 2008, treatment notes from Clifton Springs Hospital Behavioral Health Services indicated that Plaintiff had been sober for six months and was much improved, as a result of participating in Narcotics Anonymous. (465)  Later that same month, Plaintiff appeared in an "upbeat mood," and was responding well to treatment. (469)

Plaintiff asked if his treatment sessions could be reduced to twice per week, so that he could attend GED classes. *Id*.  On May 13, 2008, a treatment note indicated that Plaintiff had met his treatment goals for depression, and that even though Plaintiff felt sad from time to time, the sadness was not debilitating. (473)  In June 2008, Plaintiff indicated that he was looking forward to performing volunteer work, and was fearful of having "unstructured days" if and when his treatment stopped. (475)  Plaintiff was in a "cheerful mood" because of progress that he was making, but still reported troubling flashbacks involving sexual abuse. (477)  On July 1, 2008, Plaintiff was discharged from Clifton Spring's Continuing Day Treatment Program ("CDTP"), and transferred to a less-intensive treatment program. (483, 502)

Upon leaving the CDTP, which treatment was apparently under Tiller's supervision, Plaintiff began treating under Michaels' supervision.  (514)  Plaintiff reported that his attention span was better on Adderall. (518)  On October 10, 2008, Michaels completed a residual functional capacity ("RFC") report. (544-549)  Michaels stated that Plaintiff's ability to understand and carry out simple instructions, remember detailed instructions, exercise judgment, concentrate, follow rules, maintain social functioning, and interact with co-workers was "fair." (544-546)  Michaels indicated that Plaintiff's ability to tolerate work pressure and complete a normal workday on a sustained basis was "poor." (545-546)  When asked to describe Plaintiff's ability to remember work procedures and function independently at work, Michaels indicated that Plaintiff had not worked in years, and needed to be reassessed in those areas. (544-545)  Michaels stated that Plaintiff had "chronic mental illness," and stated diagnosis as polysubstance dependence, PTSD, major depression - recurrent, ADHD, and traumatic

brain injury ("TBI"). (547)

On April 8, 2009, Mark reported that Plaintiff was complaining of increased knee pain. (581)  Mark noted that Plaintiff's range of motion was decreased, and that there were arthritic changes. *Id.* ("X-rays taken today show much more compromise than one would expect in the lateral compartment, it is almost bone on bone with osteophytic changes noted.")  Mark recommended that Plaintiff have an injection if Synvisc, which is apparently a substance that lubricates the knee joint. *Id.*  Mark indicated, though, that Plaintiff would eventually require a knee replacement. *Id.*

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is

13

currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE)"](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[5] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d)[6]; see also,

---

[5]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(a). "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a(c).

[6]20 C.F.R. § 416.969(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are

*Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.") (citation and internal quotation marks omitted).  More specifically,

> where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate.  A claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Pratts v. Chater*, 94 F.3d at 39 (citations and internal quotation marks omitted).  Put another way, a claimant's work capacity is "significantly diminished" if the nonexertional impairments cause "the additional loss of work capacity *beyond a negligible one*." *Bapp v. Bowen*, 802 F.3d at 606 (emphasis added).  The term "negligible" is defined as "so insignificant as to be unworthy of consideration." Webster's II New College Dictionary (Houghton Mifflin Co. 1995).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

---

disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

15

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).  Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing

how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

*** 

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE ALJ'S DECISION

On October 16, 2009, the ALJ issued the decision that is the subject of this

action. (11-20).  The ALJ began by noting that Plaintiff met insured status through

March 31, 2008, and that Plaintiff must therefore demonstrate that he was disabled on or before that date. (13)  Accordingly, the issue is whether Plaintiff was disabled between March 11, 2005 and March 31, 2008.  (11-12)

At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had not engaged in substantial gainful employment since March 11, 2005. (14)

At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "arthrofibrosis, right knee; status post fracture and lateral meniscus tear, right knee; poly substance abuse, in remission; major depressive disorder; PTSD; lumbar disc degeneration without herniation or stenosis; and, a history of ADHD." (14) On the other hand, the ALJ found that Plaintiff's diagnosis of "cognitive disorder"[7] was not a severe impairment.  As to this conclusion, the ALJ found that there were "many problems" with Gaudette's diagnosis. (14)  Specifically, the ALJ declined to give "significant consideration" to Gaudette's diagnosis for the following reasons: 1) Plaintiff "may have somewhat embellished his history of head injuries," since he reported "frequent incidents of head injuries" to Gaudette, while the record otherwise indicates

---

[7]*See, Dschaak v. Astrue*, No. CV 10–1010–PK, 2011 WL 4498832 at *19 (D.Or. Aug. 15, 2011) ("The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV) defines "Cognitive Disorder Not Otherwise Specified" (294.9) as follows: 'This category is for disorders that are characterized by cognitive disfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in this section and that are not better classified as Delirium Not Otherwise Specified, Dementia Not Otherwise Specified, or Amnestic Disorder Not Otherwise Specified.... Examples include 1. Mild neurocognitive disorder: impairment in cognitive functioning as evidenced by neuropsychological testing or quantified clinical assessment, accompanied by objective evidence of a systemic general medical condition or central nervous system dysfunction ... 2. Postconcussional disorder: following a head trauma, impairment in memory or attention with associated symptoms [.]' Diagnostic and Statistical Manual of Mental Disorders 179–80 (4th ed.2000)").

only that Plaintiff had a head injury during a 2002 MVA (14); 2) Plaintiff apparently did

not tell Gaudette that he was being treated for ADHD (14); 3) a 2007 hospital discharge

summary indicated that Plaintiff had a "history" of ADHD that was "unconfirmed by

neuropsychological testing" (14); 4) the record contains "numerous references" to

Plaintiff having normal intelligence;  5) Zax's report noted inconsistencies between

Plaintiff's complaints and Zax's findings upon examining Plaintiff; and 6) Gaudette's

report indicates that the testing was performed in January 2006, but the "overall report"

indicates that it was in January 2007. (14)

At step three of the five-step analysis, the ALJ found that Plaintiff did not have a

listed impairment. (15).

At step four of the five-step analysis, the ALJ found that Plaintiff could not

perform his past relevant work, but that he had the residual functional capacity to

perform sedentary work[8], "except that he is limited to occasional operation of foot

controls with the right knee; limited to occasional climbing, kneeling, and crawling; can

remember, understand, and carry out simple instructions and maintain attention and

concentration for and perform simple, repetitive work not requiring fast paced and high

volume production." (16).   At the fifth and last step of the analysis, the ALJ found,

based on Plaintiff's "age, education, work experience, and residual functional capacity,"

that Plaintiff can perform jobs that exist in significant numbers in the national economy.

(19).  In that regard, the ALJ did not call a VE to testify at the hearing, but instead,

---

[8]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a) (West 2011).

relied solely on Medical-Vocational Guideline 201.25. (19).

ANALYSIS

### *The ALJ's RFC Assessment*

As discussed above, the ALJ found that Plaintiff had the exertional ability to perform the full range of sedentary work, despite his knee injury. (17) ("[T]here is no basis for finding that the claimant is unable to perform the prolonged sitting and limited walking and standing required of sedentary work.")  As for nonexertional limitations, the ALJ essentially rejected the opinions of Plaintiff's treating doctors, and concluded that Plaintiff had very limited nonexertional impairments. (18) ("[W]hile the claimant has some difficulty with attention and concentration he also has significant abilities in that he is able to attend GED classes. . . .  [T]he claimant can remember, understand, and carry out simple instructions and maintain attention and concentration for and perform simple, repetitive work not requiring fast paced and high volume production.").  Plaintiff maintains that the ALJ's RFC assessment is faulty because he failed to consider all of Plaintiff's nonexertional limitations, and failed to give proper weight to the treating physicians' opinions.  The Court agrees that the ALJ committed errors while evaluating the medical evidence.

At the outset, the Court finds that the ALJ did not give sufficient reasons for discounting Gaudette's report.  First, it is clear that the ALJ was mistaken when he suggested that Plaintiff had exaggerated the frequency of his head injuries because the record only referenced a single head injury in 2002 during Plaintiff's MVA.  As Defendant's counsel admitted during oral argument, the record actually contains references to additional head injuries.  The ALJ also stated that Gaudette's report bears

20

the wrong date.  On this point, although Gaudette's report indicates that the testing was performed in January 2006, the body of the report refers to events that occurred in March 2006 and the Summer of 2006 (585), which does suggest that the Report's single reference to January 2006 may have been a typographical error.  However, the Court does not believe that the ALJ should have used such error as a basis to disregard the report, without attempting to clarify the date with Gaudette.  The ALJ further commented that Plaintiff "did not mention that he was being treated for ADHD to Dr. Gaudette." (14)  However, Gaudette did not say that, and it is possible that Plaintiff did mention ADHD to Gaudette, but that Gaudette did not refer to it in the report.  Significantly, the ALJ did not seek clarification from Gaudette or from Plaintiff.  The ALJ also observed that certain categories within the tests that Gaudette peformed, such as arithmetic, showed no results, "without explanation." (14)  The ALJ, though, did not attempt to seek an explanation from Gaudette, nor did he explain why such fact cast doubt on the rest of Gaudette's report.  Finally, the ALJ found it significant that Zax's report expressed doubt over Plaintiff's claim of depression.  However, the ALJ's reliance on this point seems misplaced, since Zax was evaluating Plaintiff for depression, not a cognitive impairment.  In any event, Zax's opinion was consistent with the rest of the record insofar as it observed that Plaintiff's attention and concentration were impaired and his cognitive functioning was borderline, though it was inconsistent with the opinions of all of the treating professionals who diagnosed Plaintiff with severe depression.  Moreover, Zax opined that Plaintiff could not manage his own money, and Zax's prognosis for whether Plaintiff would be able to work was "guarded."  Accordingly, the ALJ's decision to essentially disregard Gaudette's report is not well supported.

21

Similarly, the Court finds that the ALJ erred by rejecting the opinion of Michaels. In that regard, the ALJ stated that Michaels' RFC report was "brief, conclusory, and not supported by clinical findings." (18)  However, as for being "brief" or "conclusory," the form that Michaels completed is not significantly different in length or detail from the form that the Commissioner uses. (Compare the report of agency physician C. Guarasci, 438-443 with Michaels report, 544-547)  Nor does the Court agree that Michaels' report was "not supported by clinical findings," as the ALJ stated. (18)  On this point, Michaels' RFC report is supported by her own clinical findings (Examination in June 2006, 391-393, and examination in November 2007, 689-693), as well as by Gaudette's findings.  Nevertheless, the ALJ indicated that Michaels' RFC report is contradicted by office notes from September 29, 2008[9], which showed that Plaintiff was doing well and abstaining from drugs and alcohol. (18)  In that regard, the ALJ was referring to a single office note, which admittedly shows that Plaintiff was doing well in many areas. (537)  However, a continuation of the same office note cited by the ALJ indicates that Plaintiff's mood was depressed and his affect constricted. (538)  Moreover, other office notes from the same exhibit (18F) show continuing problems. For example, on September 4, 2008, Plaintiff indicated that he was still experiencing depressed mood, OCD symptoms, and traumatic flashbacks. (514)  Moreover, a mental status exam on that date indicated that in groups, Plaintiff felt that people were staring at him and he had to leave the situation, his memory was "sometimes bad," and his attention span was "better on Adderall." (518)  Other such notes characterize Plaintiff's

---

[9]As noted earlier, the issue is whether Plaintiff was disabled on or before March 31, 2008.

intelligence as borderline. (527, 529)  Further, on September 4, 2008, office notes

indicate that Plaintiff was anxious and depressed, and his affect was constricted. (534)

Accordingly, it seems inaccurate to suggest that Michaels' RFC assessment is

inconsistent with the record as a whole.  In any event, to the extent that Michaels' RFC

report was unclear or incomplete, the Court believes that the ALJ had a duty to further

develop the record.  As to this, Michaels' report indicates that she could not give an

opinion as to certain aspects of Plaintiff's work abilities without first conducting further

testing. (544-545)

### *The ALJ Should Have Utilized a Vocational Expert*

As noted earlier, the ALJ did not call a VE to testify at the hearing.  Instead, the

ALJ relied on Medical-Vocational Guideline 201.25 to find that Plaintiff is not disabled.

Such rule provides that a "younger individual age 18-44," with an educational level of

"limited or less," whose previous work was "skilled or [required] semiskilled-skills" that

are not transferable, and who can perform sedentary work, is not disabled. 20 CFR Pt.

404, Subpart P, Appendix 2, Rule 201.25 (West 2012).  In deciding to apply the grids,

the ALJ stated that Plaintiff's

> additional limitations [i.e. his non-exertional impairments] have little or no
> effect on the occupational base of unskilled sedentary work.  A finding of
> 'not disabled' is therefore appropriate under the framework of this rule.
> Sedentary, unskilled jobs do not require the use of foot and leg controls.
> Further, the additional nonexertional limitations do not significantly restrict
> the range of unskilled sedentary work which the claimant is capable of
> performing.

(19).  However, in light of the foregoing discussion concerning the ALJ's RFC

determination, it seems that the ALJ may have improperly minimized the nature and

extent of Plaintiff's nonexertional impairments.  Assuming, *arguendo*, that such nonexertional impairments caused Plaintiff more than a negligible loss of work capacity, then the ALJ should not have relied on the grids, and should have called a VE to testify at the hearing.

CONCLUSION

For the reasons set forth above, Defendant's motion for judgment on the pleadings [#4] is denied, Plaintiff's cross-motion for judgment on the pleadings [#8] is granted, and this matter is remanded to the Commissioner for further administrative proceedings pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
       January 25, 2012

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge